# IMPORTANT NOTICE
# <u>NOT TO BE PUBLISHED OPINION</u>

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED."
PURSUANT TO THE RULES OF CIVIL PROCEDURE
PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C),
THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE
CITED OR USED AS BINDING PRECEDENT IN ANY OTHER
CASE IN ANY COURT OF THIS STATE; HOWEVER,
UNPUBLISHED KENTUCKY APPELLATE DECISIONS,
RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR
CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED
OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE
BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION
BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED
DECISION IN THE FILED DOCUMENT AND A COPY OF THE
ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE
DOCUMENT TO THE COURT AND ALL PARTIES TO THE
ACTION.

RENDERED: MARCH 19, 2009
NOT TO BE PUBLISHED

## Supreme Court of Kentucky

2007-SC-000291-MR

FINAL

DATE 4/9/09 _Kelly Klaber_ D.C.

LATHON FLOYD                                        APPELLANT

                      ON APPEAL FROM FAYETTE CIRCUIT COURT
V.                   HONORABLE SHEILA R. ISAAC, JUDGE
                          CASE NO. 06-CR-01672

COMMONWEALTH OF KENTUCKY                        APPELLEE

**MEMORANDUM OPINION OF THE COURT**

**AFFIRMING IN PART, REVERSING AND REMANDING IN PART**

Following a two-day trial in March 2007, a Fayette County jury found Lathon Floyd guilty of first-degree burglary and first-degree unlawful imprisonment, of the misdemeanor offenses terroristic threatening and third-degree criminal mischief, and of being a first-degree persistent felon. Floyd appeals as a matter of right from the Judgment of the Fayette Circuit Court convicting him of those offenses and sentencing him in accord with the jury's recommendation to concurrent terms of thirty and ten years, respectively, for the PFO-enhanced felonies, together with twelve-month terms for the misdemeanors. With the exception of the criminal mischief count, which was based on Floyd's alleged behavior after he had been taken into custody, the Commonwealth alleged that the crimes occurred during the course of an encounter between Floyd and his former girlfriend, D. W. Floyd contends (1)

that the Commonwealth failed to prove the two felonies; (2) that his right to equal protection was violated when the Commonwealth exercised jury strikes on the basis of gender; (3) that the constitutional protection against double jeopardy precludes his being punished for both unlawful imprisonment and terroristic threatening; (4) that his right to cross-examine certain Commonwealth witnesses was unduly curtailed; and (5) that he was improperly classified for parole purposes as a violent offender. We affirm Floyd's convictions, but agreeing with him that he was erroneously classified as a violent offender we reverse in part and remand for a new penalty phase.

## RELEVANT FACTS

According to the trial testimonies of both Floyd and D.W., their relationship began in July 2005 and quickly became intimate. Floyd moved in to D.W.'s Lexington apartment, and for a time they entertained hopes of starting a business that would capitalize on Floyd's experience as a body-builder. By the late winter and early spring of 2006, however, Floyd's escalating cocaine use made it impossible for him to maintain employment, and the relationship foundered. Following a particularly bad drug binge in April 2006, Floyd sought treatment at the Wayside Christian Mission in Louisville, and while he was there D.W. wrote to him ending their affair. About three weeks later, on May 13, 2006, when the treatment program ended, Floyd returned to Lexington. The next day Floyd confronted D.W. at the Extended Stay hotel on Tates Creek Road, where D.W. worked the night shift as a housekeeper. Floyd's trial centered on that confrontation.

2

The Commonwealth alleged that, unbeknownst to D.W., Floyd entered the hotel unlawfully, either by climbing through a window into room 123, where investigators later found a screen removed and Floyd's fingerprint on the glass, or, as Floyd claimed, by taking advantage of a broken service door at the rear of the building. Floyd was familiar with the building from having accompanied D.W. to work on other occasions. After all the employees except D. W. had left for the night, at about 11:30 pm, Floyd climbed the spiral staircase that led upstairs toward the laundry/supply room where D.W. did much of her work. He encountered D.W. just inside a doorway, and, according to D.W., he put his hand over her mouth, threatened to kill her, and forced her into the laundry room. There, again according to D.W., Floyd repeated his threat to kill her and said that if he could not have her then nobody else would either. He forced her to the floor, and with a braided, knotted nylon cord he strangled her hard enough to leave an abrasion around D.W's neck that was still clearly visible several hours later when investigators photographed D.W.'s injuries. D.W. testified that her throat burned and that she could feel her face growing red and hot. Fortunately, Floyd relented. He had D.W. stand, and then, with an extension cord he took from a nearby drawer, he bound her hands behind her back. D.W. testified that the binding was very painful, that she pleaded with Floyd to untie her, and that he again relented. Nevertheless, abrasions on D.W.'s wrists were also visible at the time of her examination. According to D.W., Floyd then punched her in the mouth and again knocked her to the floor. He then forcibly removed her clothing and raped her. The

punch caused bruises and swelling, and DNA analysis of samples from D.W.'s rape kit conclusively established the fact of intercourse between the two. Following the rape, according to D.W., there ensued three or four hours during which Floyd prevented D.W.'s escape by threatening her with a knife he had picked up in the laundry room and pleaded with her to resume their relationship. Promising at last to get back together with him, D.W. persuaded Floyd to let her take him to her apartment. She left him there at approximately 3:00 or 4:00 am, returned to the hotel, and called 911. The police arrested Floyd at D.W.'s apartment, where D.W. later found the nylon cord concealed in a closet. DNA analysis of a sample taken from the cord strongly suggested a mixture of Floyd's and D.W.'s DNA.

Floyd testified, on the other hand, that he had come to the hotel with D.W.'s knowledge and at her invitation, and that although he had initially lost his temper and had indeed strangled and struck her, his anger gave way to an equally intense remorse, which led to a consensual "making up" between them. After which, he testified, they spent the next few hours talking; performing some of D.W.'s hotel duties; and watching television in various places, including room 123, where he opened the window for some fresh air and clumsily knocked out the screen. During that time, he claimed, D.W. had numerous opportunities to get away from him if she desired, and the fact that she had not tried to escape, he argued, indicated that most of their encounter had been cordial and consensual. He had accepted D.W.'s invitation to her apartment believing that their relationship was truly to have another chance,

4

and his theory as to why she had instead accused him of rape was that she did not want her new boyfriend to know what she had done.

In addition to the offenses of which Floyd was convicted, the Commonwealth also charged him with first-degree rape, but he was acquitted of that charge. Floyd contends on appeal that he was likewise entitled to dismissal of the burglary and unlawful imprisonment counts. We disagree.

## ANALYSIS

### I. The Trial Court Did Not Err By Denying Floyd's Motion To Dismiss The Burglary And Unlawful Imprisonment Counts.

As the parties correctly note, upon a motion for a directed verdict, or, as here, upon a motion to dismiss some but not all of the charges,

> the trial court must draw all fair and reasonable inferences from the evidence in favor of the Commonwealth. If the evidence is sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty, a directed verdict should not be given. For the purpose of ruling on the motion, the trial court must assume that the evidence for the Commonwealth is true, but reserving to the jury questions as to the credibility and weight to be given to such testimony.
> On appellate review, the test of a directed verdict is, if under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt, only then the defendant is entitled to a directed verdict of acquittal.

Commonwealth v. Benham, 816 S.W.2d 186, 187 (Ky. 1991) (citation omitted).

### A. Floyd Was Not Entitled To Dismissal Of The Burglary Count.

Floyd contends, first, that the Commonwealth failed to prove all of the elements of first-degree burglary. That crime is defined by KRS 511.020, which

5

provides in pertinent part that a person is guilty of burglary in the first degree when

> with the intent to commit a crime, he knowingly enters or remains unlawfully in a building, and when in effecting entry or while in the building or in the immediate flight therefrom, he or another participant in the crime: . . .
> (b) Causes physical injury to any person who is not a participant in the crime; or
> (c) Uses or threatens the use of a dangerous instrument against any person who is not a participant in the crime.

Floyd does not dispute that he injured D.W. when he strangled and punched her, but he contends that he entered the hotel lawfully, at D.W.'s invitation and that he did so not intending to commit a crime but intending rather to talk to her about their relationship, about a temporary employment service paycheck Floyd believed D.W. had misappropriated, and about the belongings Floyd had left at D.W.'s apartment. Only when D.W. denied having taken the paycheck, Floyd claimed, did he lose his temper and assault her.

Although Floyd is correct that burglary does not arise merely from the commission of a crime on someone else's premises, the evidence in this case was sufficient to permit reasonable inferences that Floyd entered the hotel unlawfully intending his assault upon D.W. The jury, of course, was not obliged to accept Floyd's claim that D.W. authorized his entry, and although, as Floyd insists, the hotel was at times partly open to the public, as KRS 511.090 makes clear,

> [a] license or privilege to enter or remain in or upon premises which are only partly open to the public is

6

> not a license or privilege to enter or remain in or upon
> a part of the premises which is not open to the public.

The Commonwealth's proof and Floyd's own testimony established that Floyd entered a non-public area of the hotel, either by climbing through the window of room 123 or by using the broken service door reserved for staff and hotel guests. The evidence also showed that Floyd brought the nylon cord with him to the hotel and that immediately upon encountering D.W. he forced her to the laundry room and used the cord to strangle her. Criminal intent, of course, may be inferred from the circumstances surrounding the crime, Pollini v. Commonwealth, 172 S.W.3d 418 (Ky. 2005), and these circumstances permit a reasonable inference that Floyd came to the hotel intending to assault D.W. The trial court did not err, therefore, when it denied Floyd's motion to dismiss the burglary charge.

## B. Floyd Was Not Entitled To Dismissal Of The Unlawful Imprisonment Count.

Nor did the court err by refusing to dismiss the unlawful imprisonment charge. Under KRS 509.020, a person is guilty of unlawful imprisonment in the first degree when

> he knowingly and unlawfully restrains another person
> under circumstances which expose that person to a
> risk of serious physical injury.

Emphasizing his own testimony to the effect that after his initial angry outburst he and D.W. resumed friendly relations, Floyd contends that there was insufficient evidence of an unlawful restraint. "Restrain," for the purposes of this statute, means

7

to restrict another person's movements in such a manner as to cause a substantial interference with his liberty by moving him from one place to another or by confining him either in the place where the restriction commences or in a place to which he has been moved without consent. A person is moved or confined "without consent" when the movement or confinement is accomplished by physical force, intimidation, or deception.

KRS 509.010(2). Floyd denies D.W.'s allegations that he held a knife to her and threatened to kill her if she tried to escape, and insists that the office security video, on which D.W. twice appears entering the office unaccompanied by Floyd, and the fact that on the video she had the portable office phone with her, with which she could have called for help, make it unreasonable to believe that he "substantially interfered with [D.W.'s] liberty."

As noted above, however, Floyd was not entitled to dismissal of the unlawful imprisonment charge unless the evidence, *construed in favor of the Commonwealth,* did not permit a reasonable finding of guilt. The Commonwealth's evidence included D.W.'s testimony that after the alleged rape Floyd brandished a knife and threatened to kill her if she tried to escape or called for help. She explained that Floyd, who was familiar with the office security camera, stood not far from her just out of camera range when she went into the office to help a hotel guest and that he warned her not to raise an alarm. This testimony together with D.W's injuries and the forensic evidence was more than sufficient to raise a jury question concerning unlawful imprisonment. The trial court did not err, therefore, when it denied Floyd's motion to dismiss that charge.

8

## II. The Trial Court Did Not Abuse Its Discretion by Upholding the Commonwealth's Juror Strikes.

Floyd next contends that he was denied equal protection when the Commonwealth used five of its six peremptory challenges to strike men from the jury pool. Floyd also struck one of those five men, but he maintains that the other four were impermissibly struck on the basis of their gender. As he correctly notes, in J.E.B. v. Alabama, 511 U.S. 127 (1994), the United States Supreme Court held that the prohibition established in Batson v. Kentucky, 476 U.S. 79 (1986) against deliberate racial discrimination during jury selection applies to gender discrimination as well. We recently explained that

> [a] three-prong inquiry aids in determining whether a prosecutor's use of peremptory strikes violated the equal protection clause. Initially, discrimination may be inferred from the totality of the relevant facts associated with a prosecutor's conduct during a defendant's trial. The second prong requires a prosecutor to offer a neutral explanation for challenging those jurors in the protected class. Finally, the trial court must assess the plausibility of the prosecutor's explanation in light of all relevant evidence and determine whether the proffered reasons are legitimate or simply pretextual for discrimination against the targeted class.

McPherson v. Commonwealth, 171 S.W.3d 1, 3 (Ky. 2005) (citations and footnotes omitted). The trial court's ultimate decision on a Batson challenge "is akin to a finding of fact, which must be afforded great deference by an appellate court." Chatman v. Commonwealth, 241 S.W.3d 799, 804 (Ky. 2007) (citation omitted). "Deference," of course, does not mean that the appellate court is powerless to provide independent review. Miller-El v. Dretke, 545 U.S. 231 (2005) (holding that the trial court's finding of non-discrimination was

erroneous in light of clear and convincing evidence to the contrary), Snyder v. Louisiana, ___ U.S. ___, 128 S. Ct. 1203, 170 L. Ed. 2d 175 (2008) (same). However, the burden of showing unlawful discrimination rests with the challenger, and where, in the face of the Commonwealth's proffer of neutral, nondiscriminatory reasons for its strikes, the defendant stands mute and offers no reason for a finding of pretext, that silence "is fatal to [the defendant's] Batson claim." Chatman v. Commonwealth, 241 S.W.3d at 804.

In this case, as soon as Floyd raised his Batson challenge to the Commonwealth's four allegedly suspect peremptory strikes, the prosecutor explained that two of the strikes were of men who were living with women in unmarried relationships, as had Floyd with D.W., that one was of a man retired from a drug rehabilitation center, and that one was of a man who worked for a temporary service, all factors aside from gender giving these men something in common with Floyd. When the trial court indicated its willingness to accept these reasons as gender-neutral bases for the Commonwealth's strikes, Floyd's counsel stood silent and appeared to acquiesce; she offered no reason for rejecting the prosecutor's explanations as mere pretexts. As in Chatman, supra, therefore, the record is devoid of any basis for disturbing the trial court's ruling, and accordingly Floyd is not entitled to relief on this ground.

### III. Floyd's Convictions for Both Unlawful Imprisonment and Terroristic Threatening Did Not Subject Him to Double Jeopardy.

As noted above, Floyd was convicted of both first-degree unlawful imprisonment and third-degree terroristic threatening. Floyd contends that under the facts of this case terroristic threatening was essentially a lesser

10

included offense of unlawful imprisonment and thus that his convictions for both crimes violated the state and federal constitutional protections against double jeopardy. He concedes that this issue was not properly preserved at trial, but as we recently noted in Brooks v. Commonwealth, 217 S.W.3d 219 (Ky. 2007), "double jeopardy violations are treated as an exception to the general rules of preservation. . . . [A] double jeopardy violation may be reviewed on appeal regardless of a failure to raise it in the trial court." *Id.* at 221-22 (citing Baker v. Commonwealth, 922 S.W.2d 371 (Ky. 1996) overruled on other grounds by Dixon v. Commonwealth, 263 S.W.3d 583 (Ky. 2008)). Nonetheless, Floyd has not identified a double jeopardy violation.

As the parties correctly note, Kentucky applies the test adopted by the United States Supreme Court in Blockburger v. United States, 284 U.S. 299 (1932), to determine whether a single course of conduct has given rise to more than one offense:

> the test to be applied to determine whether there are two offenses or only one, is whether each [statutory] provision requires proof of a fact which the other does not. In other words, if each *statute* requires proof of an additional fact which the other does not, the offenses are not the same under the *Blockburger* test. Accordingly, in applying the *Blockburger* test, we must focus on the proof necessary to prove the statutory elements of each offense, rather than on the actual evidence to be presented at trial. But before applying the *Blockburger* test to a multi-purpose criminal statute, the court must construct from the alternative elements within the statute the particular formulation that applies to the case at hand.

<u>Mack v. Commonwealth</u>, 136 S.W.3d 434, 438 (Ky. 2004) (citations and internal quotation marks omitted).

The elements of first-degree unlawful imprisonment, as noted above, are (1) knowing and (2) unlawful (3) restraint (4) under circumstances which expose the restrained person to a risk of serious physical injury. KRS 509.020(1). The restraint may be accomplished either by force, intimidation, or deception, and in this case the Commonwealth alleged intimidation, that Floyd had restrained D.W. in the hotel by threatening her with a knife. As it pertains to this case, third-degree terroristic threatening has a single element: a threat to commit any crime likely to result in death or serious physical injury to another person. KRS 508.080(1)(a). The Commonwealth alleged that Floyd committed that crime when he threatened to kill D.W. Floyd contends that the same alleged threat to kill D.W. was used to establish both the restraint by intimidation element of the unlawful imprisonment charge and the terroristic threatening charge, and thus that terroristic threatening was a lesser included offense of unlawful imprisonment.

Terroristic threatening, however, does not require proof of restraint; and unlawful imprisonment by intimidation does not require that the intimidation be accomplished by a threat to commit a crime. Under the <u>Blockburger</u> test, therefore, these offenses are distinct, and thus Floyd's being found guilty of both did not violate his right not to be punished twice for the same offense. We may note, moreover, that although the jury instructions did not specify that the two offenses were based on separate threats, the jury could certainly have

believed that Floyd terroristically threatened to kill D.W. when he choked her with the nylon cord and that he later unlawfully restrained her by intimidation when he substantially interfered with her liberty by threatening to kill her with a knife. Under that, scenario, of course, the two offenses would not have arisen from the same conduct, and double jeopardy would not be implicated. There being no double jeopardy violation, Floyd is not entitled to relief on this ground.

## IV. The Trial Court Did Not Unduly Restrict Floyd's Right To Cross-Examination.

### A. Cross-Examination Concerning An Untested Hair Was Irrelevant And Thus Properly Restricted.

Floyd next contends that his defense was unduly impaired when the trial court cut short his cross-examination of three prosecution witnesses. One of those witnesses, the detective who gathered evidence at the hotel, testified that among several other items, including the fingerprint that proved to be Floyd's on the outside of the window to room 123, he collected a hair from the bathroom in that room. Another of the witnesses, the state forensic biologist who conducted the DNA tests in this case and advised the Commonwealth concerning which items should be tested, testified that she advised against testing the hair for several reasons: resource constraints preclude testing all samples, testing the hair was not likely to result in probative evidence, testing hairs is more difficult than testing body fluid samples, and D.W.'s rape kit and two towels collected from the hotel offered sperm samples the testing of which was easier and far more likely to provide worthwhile evidence. The sperm

13

samples, moreover, proved with virtual certainty to be Floyd's, and thus rendered further testing of the hair unnecessary.

Despite the detective's testimony that he had no say in determining which items were tested, Floyd's counsel asked him more than once why the hair had not been tested. When the Commonwealth objected, the court noted that the hair's relevance was marginal at best and ordered defense counsel to move on to a different line of questioning. Again, during cross-examination of the biologist and after she had given the above explanation for advising against testing the hair, Floyd's counsel entered into a series of questions concerning an alternative DNA test sometimes applied to hairs. When the Commonwealth objected on relevance grounds, the court sustained the objection and admonished counsel against irrelevant questioning. Floyd contends that his right to effective cross-examination was unduly curtailed by the trial court's rulings.

He is correct of course, that with KRE 611 Kentucky has adopted the "wide open" approach to cross-examination, "allowing questioning as to any matter *relevant* to any issue in the case." Derossett v. Commonwealth, 867 S.W.2d 195, 198 (Ky. 1993). He is also correct that meaningful cross-examination is a right protected by the Confrontation Clause of the Sixth Amendment to the United States Constitution. Delaware v. Van Arsdall, 475 U.S. 673 (1986). These rights, however, are both subject to reasonable limitation.

> Indeed, the trial courts "retain wide latitude insofar as the Confrontation Clause is concerned to impose

14

reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant."

Davenport v. Commonwealth, 177 S.W.3d 763, 768 (Ky. 2005) (quoting from

Van Arsdall, 475 U.S. at 679). Under KRE 611, moreover,

"While the trial court may not limit cross-examination because it involves matters not covered on direct, it may limit such examination when limitations become necessary to further the search for truth, avoid a waste of time, or protect witnesses against unfair and unnecessary attack."

Derossett v. Commonwealth, 867 S.W.2d at 198 (quoting from Lawson, *The Kentucky Evidence Law Handbook* § 3.20(11) (3d ed. 1993)).

The trial court did not abuse its discretion in this case by curtailing questions pertaining to the untested hair. The hair was not relevant to the rape charge because Floyd admitted, and the DNA testing of D.W.'s rape kit established, the fact of intercourse between Floyd and D.W. Nor was the hair relevant to the burglary charge, again because Floyd admitted that he had been in room 123, where, he testified, he and D.W. watched T.V. and he touched the window while opening it for fresh air. Because proof that the hair had not been tested and so may have come from someone other than Floyd thus had absolutely no bearing whatsoever on a material issue in the case, the trial court was well within its discretion when it ordered counsel to desist from her questions.

15

## B. Cross-Examination Concerning The Victim's Sexual Practices Was Properly Limited as More Harassing Than Probative.

The third occasion when the trial court limited Floyd's questioning was during his cross-examination of D.W. D.W.'s rape examination had disclosed a patch of genital irritation, but the nurse examiner had determined, and D.W. admitted during her direct examination, that the irritation was not the result of the alleged rape, but rather resulted from a genital piercing where D.W. wore a ring. She testified that not long before Floyd's alleged assault, she had replaced an earlier ring with a new, larger one and that the new ring had caused a mild infection. During cross-examination, Floyd's counsel asked D.W. whether Floyd had not recognized the ring as a new one and asked her about it, and she admitted that he had. Counsel then asked whether the new ring could not be made to function as a "sex toy," whereupon the Commonwealth objected on the grounds that the question violated the rape shield provisions of KRE 412 and also because the prejudicial effect of the purported evidence outweighed its probative value. Sustaining the objection, the trial court ruled that the purported "sex toy" evidence was irrelevant. Floyd later testified that after he and D.W. had consensual sex in the hotel's laundry room, D.W. told him how the new ring could serve as a "sex toy," and he argued that D.W. would not have shared such an intimate detail had their intercourse and their ensuing time together not been voluntary. He contends that he should have been permitted to pursue this line of questioning on cross-examination as a means of challenging D.W.'s credibility.

Although Floyd did not preserve D.W.'s excluded testimony by avowal, before the Commonwealth could lodge its objection, D.W. denied telling Floyd about the purported "sex toy," and thus the issue arguably permits review. We agree with the Commonwealth, that even if this evidence was relevant as having some bearing, however slight, on the nature of Floyd's and D.W.'s encounter that night, its probative value was far outweighed by its tendency to harass and unfairly attack D.W., reasons, as noted above, within the trial court's discretion for limiting cross-examination. We also agree with the Commonwealth, that Floyd has failed to establish any prejudice as a result of the alleged error, for as noted, notwithstanding the trial court's ruling, Floyd succeeded in eliciting a denial from D.W. concerning the "sex toy," and otherwise he fully presented his "sex toy" allegations to the jury. We conclude, therefore, that even if the trial court's reliance on relevance as a ground for excluding the "sex toy" cross-examination was incorrect, the error was harmless and does not entitle Floyd to relief, inasmuch as there were other, valid grounds for disallowing the questioning and because there is no reasonable possibility that the exclusion of the cross-examination contributed to Floyd's conviction. Anderson v. Commonwealth, 231 S.W.3d 117 (Ky. 2007).

## V. The Trial Court's Sentencing Floyd as a Violent Offender Was Palpable Error And the Facts Compel a New Penalty Phase.

Floyd's final allegation of error concerns his eligibility for parole. During her closing at the penalty phase of trial, Floyd's counsel told the jury that because Floyd's crime was a burglary involving a physical injury the law would require him to serve 85% of his sentence before he could be considered for

17

parole. She used this supposed limit on Floyd's parole eligibility to argue for a sentence toward the minimum end of the applicable sentencing range. Neither the Commonwealth nor the court raised any question about this argument, and after lengthy deliberation the jury recommended a total sentence of thirty years, which was toward the minimum end of the twenty to seventy year range the jury considered. In its final Judgment the trial court noted

> that the jury found the defendant guilty of Ct. 2, Burglary 1st Degree under an instruction which required a finding that
>
> "When in effecting entry or while in the building or in immediate flight therefrom, he
> i. Used or threatened the use of a dangerous instrument against Donna Williams; or
> ii. Caused physical injury to Donna Williams."
>
> Following the reading of the verdict and the dismissal of the jury, the defendant, with advice of counsel, knowingly and voluntarily waived a separate sentencing hearing and asked to have judgment pronounced. The court further advised the defendant that he was ineligible for probation consideration pursuant to KRS 532.080(7), 532.040 and 439.3401.

Floyd now contends that the trial court erred by invoking KRS 439.3401, the so-called violent offender statute, which in addition to declaring that violent offenders are ineligible for probation also requires that they serve 85% of their sentences before being considered for parole. He concedes that this error was not preserved by a timely objection. Indeed, his own counsel's closing argument was premised on Floyd being a violent offender. Nevertheless, he requests review under the palpable error standard of RCr 10.26.

18

Under that rule, an unpreserved error may be noticed on appeal only if the error is "palpable" and "affects the substantial rights of a party," and even then relief is appropriate only "upon a determination that manifest injustice has resulted from the error." An error is "palpable," we have explained, only if it is clear or plain under current law, Brewer v. Commonwealth, 206 S.W.3d 343 (Ky. 2006), and in general a palpable error "affects the substantial rights of a party" only if "it is more likely than ordinary error to have affected the judgment." Ernst v. Commonwealth, 160 S.W.3d 744, 762 (Ky. 2005). An unpreserved error that is both palpable and prejudicial still does not justify relief unless the reviewing court further determines that it has resulted in a manifest injustice, unless, in other words, the error so seriously affected the fairness, integrity, or public reputation of the proceeding as to be "shocking or jurisprudentially intolerable." Martin v. Commonwealth, 207 S.W.3d 1, 4 (Ky. 2006). Floyd's claim meets this standard.

As Floyd notes, "violent offender," for these purposes, means, in pertinent part

> any person who has been convicted of or pled guilty to the commission of a . . . Class B felony involving the death of the victim or serious physical injury to a victim, or rape in the first degree, . . . burglary in the first degree accompanied by the commission or attempted commission of a felony sexual offense in KRS Chapter 510, burglary in the first degree accompanied by the commission or attempted commission of an assault described in KRS 508.010, 508.020, 508.032, or 508.060, burglary in the first degree accompanied by commission or attempted commission of kidnapping as prohibited by KRS 509.040, or robbery in the first degree. The court shall

> designate in its judgment if the victim suffered death
> or serious physical injury.

KRS 439.3401(1) (2002). Although Floyd was convicted of first-degree burglary, a Class B felony, he correctly observes that by itself that fact does not render him a "violent offender," and he contends that none of the other necessary conditions applies: he was acquitted of rape, was not charged with, much less convicted of, either another sexual offense, assault, kidnapping, or robbery, and, he claims, he did not seriously injure D.W.

The Commonwealth rejoins that Floyd's burglary may be deemed to have been "accompanied" by a qualifying assault, since Floyd admitted that he struck and strangled D.W and the evidence showed that he injured her. It also insists that D.W.'s injuries may be deemed "serious" under the statute. We disagree with both of these arguments.

Addressing the Commonwealth's second argument first, we may begin by noting, as do the parties, that the statute requires a "serious physical injury," not just a physical injury and that under the Penal Code "serious physical injury" means

> physical injury which creates a substantial risk of
> death, or which causes serious and prolonged
> disfigurement, prolonged impairment of health, or
> prolonged loss or impairment of the function of any
> bodily organ.

KRS 500.080(15). Floyd contends that his choking and striking of D.W. did not leave her disfigured or impaired, and, he insists, it did not result in an injury which posed a substantial risk of death. He notes further that under the burglary instruction the jury found only that he injured D.W., not that he

20

seriously injured her, and that the court's judgment failed to designate that D.W. suffered a serious physical injury.

We agree with Floyd that the Penal Code definition of "serious physical injury" is appropriately applied to the non-Penal Code violent offender statute inasmuch as absent some clear indication to the contrary the General Assembly may be presumed to have intended the two provisions to harmonize. *See* Brooks v. Commonwealth, 114 S.W.3d 818 (Ky. 2003) (applying the KRS 500.080 definition).

We further agree that the trial court lacked grounds for believing that D.W.'s injury was "serious" for statutory purposes. There was no proof that D.W.'s injuries had a prolonged effect, nor were the injuries themselves—the abrasions and contusions to D.W.'s face, neck, and wrists—life-threatening. Although Floyd's attack was certainly violent enough to threaten death, it is "the severity of the resulting injury rather than . . . the nature of the attack," that is the test for "serious physical injury" under the Penal Code. Commonwealth v. Hocker, 865 S.W.2d 323, 325 (Ky. 1993); Luttrell v. Commonwealth, 554 S.W.2d 75 (Ky. 1977). We agree with Floyd, accordingly, that he may not be deemed a violent offender for having inflicted a "serious physical injury."

With respect to the Commonwealth's argument that Floyd's burglary may be deemed to have been accompanied by an uncharged assault—we are convinced that the statutory "accompanied by" means, rather, that the conviction for first-degree burglary is accompanied by a conviction for one of

21

the other designated offenses. The statutory requirement of a "commission or attempted commission" of the companion offense connotes a jury determination that the offense was committed or attempted. Otherwise the trial court would be thrust into an inappropriate role as fact finder.

Although we thus agree with Floyd that the trial court erred by designating him a violent offender, as noted above, Floyd is not entitled to relief from this unpreserved error unless it is more likely to have prejudiced his judgment than ordinary error and unless it resulted in manifest injustice. We agree with Floyd that the substantial and unauthorized delay in his being considered for parole is both highly prejudicial—it could result in years being added to his prison time—and manifestly unjust, inasmuch as the unlawful extension of a sentence is something that strikes at the public reputation of the courts and can easily seem a shocking departure from the rule of law. Floyd is entitled to relief, therefore, but not simply the removal from his judgment of the violent offender reference. Because the length of Floyd's sentence was likely affected by his own counsel's erroneous argument concerning his parole eligibility, we agree with the Commonwealth that given our finding of palpable error a new penalty phase is appropriate. Thus, we reverse and remand for a new penalty phase untainted by the erroneous information that Floyd was a violent offender.

## CONCLUSION

In sum, the Commonwealth adequately proved that on the night of May 14, 2006, Floyd burglarized the Extended Stay Hotel in Lexington and that

during that night and through the early morning hours of May 15 he unlawfully imprisoned D.W. The unlawful imprisonment offense was distinct, for double jeopardy purposes, from Floyd's additional offense of terroristic threatening. Floyd was not denied an adequate opportunity to cross-examine D.W. or other witnesses, and in the absence of any facts, much less clear and convincing facts, suggesting that the Commonwealth's facially gender-neutral reasons for striking certain male jurors were pretextual, the trial court cannot be said to have abused its discretion when it approved those strikes. We affirm, accordingly, the April 2, 2007 Judgment of the Fayette Circuit Court to the extent that it convicts Floyd of first-degree burglary, first-degree unlawful imprisonment, terroristic threatening, and third-degree criminal mischief. Because the penalty phase was marred, however, by the erroneous assumption that his parole eligibility would be governed by the violent offender restrictions, we reverse the Judgment to the extent that it imposes sentence and remand to the Fayette Circuit Court for a penalty phase in conformance with this opinion.

All sitting. All concur.

COUNSEL FOR APPELLANT:

Samuel N. Potter
Department of Public Advocacy
100 Fair Oaks Lane
Frankfort, KY  40601


COUNSEL FOR APPELLEE:

Jack Conway
Attorney General

Heather Michelle Fryman
Assistant Attorney General
Office of Criminal Appeals
Office of the Attorney General
1024 Capital Center Drive
Frankfort, KY  40601